**UNITED STATES ex rel. MITCHELL v. THOMPSON.**

District Court, S. D. New York.

July 1, 1944.

684

George Kennan Hourwich, of New York City, for petitioner.

James B. M. McNally and John C. Hilly, both of New York City, for respondent.

RIFKIND, District Judge.

The petitioner was convicted of a violation of the Mann Act, 18 U.S.C.A. § 397 et seq., on March 17, 1942, and on the same day, sentenced to imprisonment for a term of four years and ten months. His conviction was affirmed by a divided court on July 26, 1943, United States v. Mitchell, 2 Cir., 137 F.2d 1006. Subsequently, on November 8, 1943, after rehearing granted by the Circuit Court, the judgment was confirmed, again by a divided court, 138 F.2d 831. Petitioner's application for a writ of certiorari was denied by the United States Supreme Court. 64 S.Ct. 785. Prior to his appeal to the Circuit Court of Appeals, the petitioner had filed a petition for a writ of habeas corpus which was dismissed by the district court on November 12, 1942.

The present petition for a writ of habeas corpus was filed on March 10, 1944. On petitioner's declaration that he could not employ counsel to assist him in this proceeding, the court, after a preliminary hearing which indicated that the petition was not frivolous, on March 30, 1944, assigned counsel to represent him on the trial of the issues raised by the petition and return. In view of the fact that the petition was drawn by the petitioner himself and apparently without the aid of counsel, the court suggested that counsel for the petitioner and the United States Attorney stipulate the issues to be tried, so that petitioner should not suffer for lack of skill in framing his allegations. Such a stipulation was made by the attorneys and approved by the petitioner.

The government has extended to the petitioner every requested facility in the preparation of the case, including the production of papers and records and assistance in assembling petitioner's witnesses; and the attorney assigned to assist the petitioner conducted the hearing with conspicuous skill and rare devotion. The hearing commenced on May 15th and continued through May 18th, 1944. The stipulation defining the issues reads as follows:

"1. Whether the petitioner was deprived of his constitutional right to the assistance of counsel in the preparation for the trial of Indictment C 111-319 against him, and whether the petitioner was deprived of the assistance of counsel in the trial upon such indictment in view of the character of the preparation for such trial.

"2. Whether the petitioner was denied his constitutional right to prepare for the trial of the aforesaid indictment, in that he was denied the right or unconstitutionally or illegally limited in the exercise of the right to communicate with witnesses or other persons in connection with the preparation for the trial of the aforesaid indictment and/or was unconstitutionally or illegally denied the right, or unconstitutionally or illegally interfered with in the exercise of the right, of access to documents necessary or useful in the preparation for the trial upon the aforesaid indictment.

"3. Whether or not the petitioner was deprived of his constitutional right to the assistance of counsel upon the trial upon the aforesaid indictment, in that the counsel assigned to represent him thereat at the time of such appointment, or theretofore, had been, counsel for another person whose interests conflicted with the representation of the petitioner.

"4. Whether the conviction of the petitioner upon the aforesaid indictment was illegally or unconstitutionally obtained, in that such conviction was procured through the use by the United States Government upon the trial of testimony obtained through the coercion of the petitioner's wife to testify against him.

"5. It is stipulated that agreement upon these issues shall not be deemed to bar the United States from claiming now or hereafter that the determination of the issues

as stated is not material as a matter of law to a decision of the habeas corpus proceeding."

 The petitioner is a negro and at the time of his conviction was about 22 years of age. He has had very little schooling but is not unintelligent. He has not led an exemplary life. Considering the heinous character of the crime of which he was convicted, the sentence imposed, his lack of education and lack of financial means, I was prompted to overlook the formal inadequacy of his petition prepared by him in jail. Moreover, the petition suggested that he had been deprived of his constitutional right to the assistance of counsel. Since the denial of that right involves a loss of jurisdiction to enter a valid judgment of conviction, Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357, I concluded that the petition presented a case when a judge "should be alert to examine 'the facts for himself when if true as alleged they make the trial absolutely void.'" Id., 304 U.S. at page 468, 58 S.Ct. at page 1025, 82 L.Ed. 1461, 146 A.L.R. 357.

 First, I dispose of item 4 of the stipulation. No evidence in support of the claimed coercion of the government's principal witness was adduced; and the witnesses called by petitioner for the purpose of proving that claim, denied it emphatically. The principal witness herself could not be produced, it appearing that she had died a suicide.

Second, the first and third items of the stipulation together raise the issue whether petitioner was deprived of his right to the assistance of counsel both during the preparation for the trial and upon trial. The testimony discloses that the petitioner was arrested on February 9, 1942 and promptly arraigned before a commissioner upon a complaint charging a violation of the Mann Act. He was unable to furnish bail and was committed to the Federal House of Detention, New York City. A person engaged in the business of furnishing bail bonds recommended Mr. Brandenburg as an attorney. The petitioner communicated with this attorney by letter and received a visit from him on February 16, 1942. In the course of the interview which followed petitioner suggested that Mr. Brandenburg see Mrs. Mitchell, his wife, who was then detained in the Women's Detention House as a material witness. Mr. Brand-

enburg thereupon filed a notice of appearance for Mrs. Mitchell as a material witness in order to gain admittance to see her. He had received no authorization from her to represent her. On February 17th he interviewed her and discovered that she was the government's principal witness and that she was very hostile to the petitioner. He promptly reported that to the petitioner. Exactly by what method this report was made the evidence does not disclose. The petitioner, however, produced a letter from Mr. Brandenburg, dated February 20, 1942, which refers to such prior communication. In the letter of February 20th Mr. Brandenburg also stated: "If you wish to have me represent you, it will be necessary for you to raise some funds. Until I hear from you regarding this matter I will do nothing on your behalf".

Brandenburg testified that he did not in fact abandon his client at that time; that he continued to seek out friends of the petitioner for the double purpose of raising funds for the defense and of obtaining testimony favorable to the petitioner. He specifically testified that after the writing of the letter he prepared a memorandum of law for use upon the trial. He is corroborated by the record facts that on February 25th he appeared for the petitioner when he was arraigned upon the indictment which had been filed February 20th; that he requested an adjournment to March 4th for pleading, which was granted; that he appeared again for the petitioner on March 4th, when the plea of not guilty was received, and succeeded in obtaining an adjournment of the trial date to March 11th. Brandenburg also testified that on each of the days mentioned he had conferred with the petitioner and while his estimate of the length of the conferences is unquestionably exaggerated, the petitioner did not deny that the conferences occurred. Brandenburg claimed that in the aggregate the conferences occupied between four and six hours. The petitioner estimated thirty minutes.

The testimony further discloses that on the adjourned date, namely, on March 11th, Brandenburg and not the petitioner took the initiative to sever the attorney-client relationship. He asked the court for leave to withdraw on the ground that he had not been paid. The presiding judge granted the attorney's application and, upon the petitioner's statement that he could not afford to retain a lawyer, promptly

686

appointed Brandenburg to represent him. This was done in open court in the petitioner's presence and the evidence is uncontradicted that the petitioner made no gesture of dissatisfaction with the court's order.

The case was not reached for trial on March 11th and was further adjourned to March 13th. On that day the trial began. Petitioner was in court and was seated alongside Mr. Brandenburg, his assigned counsel, during the selection of the jury and the opening statements to the jury by both attorneys. Throughout these proceedings petitioner voiced no objection to the action of the court in assigning Brandenburg as his counsel. From the 13th of March the trial went over to Monday, the 16th of March. Immediately after the first witness was sworn the petitioner asked for the dismissal of the attorney assigned to him. So much is disclosed by the transcript of the trial minutes. Upon this hearing Brandenburg testified that petitioner had also shouted in substance that he could not get a fair trial from a white judge, a white jury and a white lawyer and that thereupon the presiding judge said: "Sit down the jury will disregard this demonstration"; that he, Brandenburg, then moved for the withdrawal of a juror; that the judge denied the motion and commented that he would hold Brandenburg in contempt if he further harassed the proceedings. The transcript of the trial minutes contains no reference to such a motion nor to such comment by the judge. The petitioner denied that he had made the statement attributed to him by Brandenburg.

On direct examination of Brandenburg on behalf of the petitioner, in an effort to establish his lack of qualification as an attorney, it developed that Brandenburg had been admitted to practice in New York in 1937 and in the federal courts of the Eastern and Southern Districts in 1939; that he had acted as attorney in about 50 to 100 criminal proceedings.

It appeared that on May 19, 1943 (more than a year after the conviction) Brandenburg furnished to the United States Attorney an affidavit for use upon the petitioner's appeal to the Circuit Court of Appeals and that on February 14, 1944, he furnished a similar affidavit to the United States Attorney for use in connection with the petition to the Supreme Court for a writ of certiorari. These affidavits were not volunteered by Brandenburg but

were given in response to requests. It is not suggested that they contained privileged matter.

It also appeared that a year after the conviction, Brandenburg appeared for the wife of the petitioner on a charge of shoplifting.

Finally, counsel for petitioner has invited the court's attention to the transcript of the trial minutes as evidence of the attorney's lack of preparation, lack of skill or both. It is worthy of note, however, that petitioner through his counsel asserted his privilege when the government sought to elicit from Brandenburg his conversations with the petitioner with respect to the conduct of the trial.

I am inclined to the view that when one puts his attorney's conduct of a case in issue, as this petitioner has done, he thereby waives the privilege as to confidential communications between him and his attorney, which are relevant to that issue. It might well be that actions or omissions on the part of an attorney, now offered as proof of lack of skill or preparation, were induced by the direct command of the client. However, I preferred to err in favor of sustaining the privilege, but in so ruling I called petitioner's attention to the possibility that I might infer from the assertion of the privilege that the excluded evidence would not be helpful to his cause and I directed his consideration specifically to the rule that in this proceeding the burden of proof was upon the petitioner. Johnson v. Zerbst, supra.

■ It is now firmly established that the fair trial to which a defendant is entitled in a federal court upon prosecution for a felony includes as one of its indispensable elements the right to assistance of counsel both during preparation for trial as well as at the trial. Powell v. Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357; Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

■ Petitioner argues that the recited facts show a denial of that right by reason of lack of preparation and lack of expertise on part of counsel assigned by the court and by reason of such counsel's conflict of interest. I agree that if petitioner had established facts warranting the conclusion that he had been denied the right to

the effective assistance of counsel, the court would not be concerned with "nice calculations as to the amount of prejudice arising from its denial." Glasser v. United States, supra, 315 U.S. at page 76, 62 S.Ct. at page 467, 86 L.Ed. 680. But the necessary facts have not been established. The claim of a conflict of interest is built entirely upon the notice of appearance which Brandenburg filed for the petitioner's wife, on his own motion and without authority from her. He used the notice of appearance as a passport to gain admission to the Women's Detention Headquarters in order to interview his client's wife in accordance with his client's instructions. An attorney-client relationship is created by the grace of the client and consent of the attorney. It does not spring into being by the attorney's act of self-designation. It nowhere appears that Brandenburg ever became her lawyer. Indeed, she was detained not as a defendant but as a material witness. While, of course, that would not preclude the formation of an attorney-client relationship, it does tend to negative any tenuous inference that might be drawn from the mere fact of the interview. The fact that a year later Mrs. Mitchell retained Brandenburg to defend her against a shoplifting charge shows only that she was more amply impressed with his ability than the petitioner.

True, Brandenburg did not inform the judge when he assigned him as petitioner's attorney that he had spoken to Mrs. Mitchell. There was no occasion for such a disclosure; and what is more important the petitioner was of course informed thereof. And not until the filing of the petition herein had he ever complained on that score. Moreover, Brandenburg's failure to disclose any obligation to Mrs. Mitchell tends to contradict the existence of any conflict, for it is reasonable to suppose that he would have asserted the conflict in order to escape the burden of rendering a gratuitous service.

I find that Brandenburg was not subject to any conflicting loyalty which would disqualify him from acting as petitioner's attorney.

█ The question remains whether petitioner has had the effective assistance of counsel. "The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." Avery v. Alabama, 1940, 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377. And in Powell

v. Alabama, supra, 287 U.S. at page 71, 53 S.Ct. at page 65, 77 L. Ed. 158, 84 A.L.R. 527, the court held that where the duty to appoint counsel arises it "is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." In order to determine whether petitioner has been deprived of his constitutional right it becomes my duty to canvass the several factors relevant thereto regardless whether they fit into the precise terms of the issues as stipulated. These facts are: 1, the time of the appointment; 2, the circumstances of the appointment; 3, the opportunity afforded the appointee to confer and prepare; and, 4, the qualifications of the appointee.

The appointment occurred on March 11, 1942. At the time of the appointment the trial judge had knowledge that the same attorney had acted for the petitioner at least since February 25th, when he appeared before him to request an adjournment of the date of pleading. Actually, the attorney had acted for the petitioner since February 16th at which time, although the indictment had not been filed, the petitioner well knew from the complaint the nature of the charge on which he was detained. The empanelling of the jury did not occur until the afternoon of March 13th; and the first witness was not examined until March 16th. Certainly this case presents no such picture of haste as occurred in Johnson v. Zerbst, supra. Petitioner had ample time to prepare his defense.

█ The circumstance that the attorney appointed was the very one whom the petitioner had retained but found unable to pay, I regard as one of which the petitioner ought not to complain. The practice is not uncommon. An attorney finding his client unable to pay, though willing to continue his services gratis, very properly desires to have his continued services commanded by the court. The advantage accruing to him therefrom is that the court in making the appointment will take note thereof before burdening him with another unpaid-for assignment. There may, of course, be cases where the refusal to pay has resulted in such antagonism between attorney and client that another attorney ought to be appointed. People v. Thompson, 1923, 205 App.Div. 581, 199 N.Y.S. 868. But there is no evidence before me that the attorney in this instance harbored

any such antagonism or that the client feared any such hostility. On the contrary, the attorney testified in this proceeding that he regarded it as a duty to honor the court's appointment, that he accepted it without disfavor and that the petitioner evinced no disapproval.

Nor can the attorney's incompetence be assigned as ground for petitioner's release. Granted that an appointed attorney may prove to be so incompetent, negligent or unfaithful that the accused may be said to have been without the assistance of counsel, Williams v. State, 1941, 192 Ga. 247, 15 S.E.2d 219, 225, the facts here show no such condition. Achtien v. Dowd, 7 Cir., 117 F.2d 989.[1]

█ The lawyer assigned was neither very young nor inexperienced. Unquestionably, now that the record is made, able counsel can go over every question and perhaps frame a better one, may assign better reasons for objections taken, may suggest avenues of cross-examination which did not occur to him who actually faced the court and jury. So, too, military strategists go over the movements of lost battles and demonstrate how it might have been won. The short answer to this line of argument is that the constitution does not guarantee the assistance of the most brilliant counsel.

█ It is suggested that even if counsel were competent and had the opportunity to confer with petitioner and to prepare for trial he did not in fact embrace the opportunity. It is not disputed that the attorney conferred with the petitioner on February 16th and 25th and on March 4, 11th and 13th before the trial began; that petitioner sat with his attorney at the counsel table throughout the selection of a jury on March 13th and during the balance of the trial on March 16th and 17th. The petitioner has testified that these conferences were of few moments duration. That his self-interest prompted him to minimize the estimate of time consumed cannot be doubted; and nothing whatever has been shown to indicate that any avenue of investigation or any line of evidence would have been produced by further conference, Avery v. Alabama, supra, 308 U.S. at page 452, 60 S.Ct. 321, 84 L.Ed.

377. True, where there has been a denial of the assistance of counsel we should not indulge in "nice calculations" of prejudice. Where, however, counsel has been provided, the presumption is in favor of regularity. Johnson v. Zerbst, supra, 304 U.S. at page 468, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357.

Upon the argument the point was suggested that petitioner did not have counsel of his choice. More broadly stated, it was urged that in appointing counsel it was encumbent upon the court to assure itself that the appointed attorney enjoyed the confidence of the accused. Substantially this point was already passed upon in the two opinions of the Circuit Court of Appeals affirming the conviction. I venture into it only because the question is presented to me on a fuller record than was available to that court. Some support for petitioner's argument is derived from the dissenting opinion in the circuit court of appeals on reargument, where the quotation, "counsel of his own choosing" is bracketed to the quotation from the Glasser case that "the right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." [138 F.2d 834.]

█ In the Glasser case the court was dealing with self-retained counsel encumbered by the court with the burden of defending a codefendant. Here we are dealing with assigned counsel. I have always believed the law to be that the choice of counsel for indigent persons accused of crime was the court's and not the defendant's. Otherwise, pre-eminence at the bar would be the surest road to bankruptcy. In making the assignment the court concerns itself with the qualification of the appointee to perform the task; that includes when necessary the avoidance of conflicting duties on part of the attorney. The court is also concerned to avoid imposing too many burdens on any one lawyer. It has been my understanding that the courts need have no concern with the private predilections of the defendant for a lawyer of a specified color (Achtien v. Dowd, supra), or sex or age or political affiliation; and that the defendant may not

---

[1] "There is a rather well-defined recollection on the part of the court, backed by our observations, that all lawyers must have their first cases * * *." 117 F. 2d at page 992.

name the lawyer whom the court must appoint.[2]

To confer upon every indigent defendant the power of "senatorial courtesy" with respect to the court's appointee would, in my judgment, lead only to reluctance on the part of attorneys to accept appointments in unpopular causes, for in effect the appointment would then come by grace of the accused and not of the court. I, therefore, do not propose to follow such a rule until an appellate court commands me to do otherwise.

█ It seems to me the choice must be the court's and not the defendant's and that such a choice should not be subject to impeachment on the ground of a claimed displeasure with the appointment or lack of confidence in the attorney unless there is good cause why the appointment should not have been made. Even for those who can afford the luxury, the power to choose one's counsel is not as broad as the right. The preferred attorney may not be available or his price may be beyond reach or he may be unwilling to undertake the retainer. Criminality and poverty are not twins and the poor like the affluent are entitled to counsel when accused of crime. Since the government has made no provision for indigent defendants. the power to command the free services of attorneys must be vested some place. As between conferring that power upon the defendant, who will take account of no consideration but his own desires, and the court, which can and will take other items into view, I believe the balance of advantage lies in vesting that power in the court.

In re Mandell, 2 Cir., 1934, 69 F.2d 830, neither says nor holds anything inconsistent with the views expressed herein.

█ My conclusion is that the petitioner has not been deprived of the assistance of counsel during the preparation for trial or during the trial.

█ Item 2 of the stipulation challenges the system of detaining defendants awaiting trial as practiced in the Federal Detention Headquarters in New York. The rules governing such inmates limit the number of visitors, limit the amount and frequency of written correspondence and subject all correspondence to censorship.

It is contended that such regulations impeded the ability of the petitioner to prepare for trial. It is not suggested that there is any restriction on visits by attorneys except that specified hours are designated for the purpose and no complaint is made of that regulation. An inmate submits a list of correspondents which, when approved, becomes the list of authorized correspondents to whom he may send two letters a week at government expense and from whom he may receive an unlimited number of communications. The rules do not permit a married male to have on his authorized list the name of any female other than his wife. In addition, an inmate may send "special purpose" letters to any one and with unlimited frequency provided he obtains the approval of a "parole officer". The records of the Detention Headquarters show that from February 9th to March 17th, 1942, the petitioner dispatched nine regular letters and received twenty six regular letters; that he sent three special purpose letters and received none. Regular letters were examined by the censor, special purpose letters by the parole officer.

Except as will be hereinafter indicated there is no evidence that the petitioner was ever refused permission to dispatch any communication. The exception relates to a letter which he presented on February 27th, addressed to his wife. The records show that the parole officer communicated with an assistant U.S. attorney who advised that the letter be withheld from mailing for a few days. No evidence of the contents of the communication was offered.

There is no evidence that any communications received were not delivered to the petitioner except one telegram, dated February 21, 1942, which is in evidence. That telegram is signed "Miss Murray", acknowledges receipt of a letter from petitioner and asks for further information with a view to assisting petitioner and his wife. Miss Murray was not on the authorized list of correspondents. One Louis Murray was on the list and it is within the probabilities that the petitioner used the name Louis Murray in order to correspond with Miss Murray in violation of the regulations. An officer

---

[2] The system of public defenders, advocated by many as a solution of this problem, would be unattainable if the accused had the right to name the attorney to be assigned.

of the Detention Headquarters testified concerning the general practice with respect to communications received from unauthorized correspondents. He stated that within the discretion of the parole officer such a communication is either delivered to the inmate or returned to the sender or deposited in the inmate's property folder. Before such deposit in the property folder such a communication is generally not shown to the inmate but sometimes it is. This telegram was deposited in the property folder. Under these circumstances the failure of the petitioner to testify that he did not see the telegram or that he failed to reach Miss Murray warrants the inference that knowledge of the telegram did reach him.

There was testimony that the object of the censorship was to intercept plans for the escape of inmates, schemes for the introduction of contraband and the fomenting of further criminal activity.

 An inmate detained for want of bail and awaiting trial is assumed to be innocent of crime. His detention is for the purpose of assuring his presence at the trial. Restraint going beyond this purpose must find its justification, if any, in reasons other than the requirements of the prosecution in bringing him to trial. Some regulation is implicit in the very fact of confinement. How much regulation is justified is a question of degree which a limited inquiry by a court in a particular case cannot hope adequately to answer. Whether broader inquiries have been had which serve to justify these rules has not been called to my attention. There is a manifest difference between the position of a defendant before trial and that of a sentenced defendant awaiting transportation to a penal institution. The difference seems to warrant some difference in treatment. Here again a single habeas corpus proceeding is an inadequate instrument of inquiry to determine what differences are permissible and advantageous. Nor would it follow, if we decided that the rigors of the confinement and censorship were excessive, that the petitioner would be entitled to his discharge. Even if it were to appear that the law had been violated in his detention it would not necessarily follow that such violation of law entitles the petitioner to a discharge. (Thus, for instance, an unreasonable delay in arraignment after arrest is unlawful and may result in the exclusion of confessions obtained during such period of unlawful delay, McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, but that does not foreclose the prosecution; likewise information obtained by wiretapping, because unlawful, may not be received in evidence but that illegality does not frustrate the prosecution.) We must still examine whether petitioner has been so prejudiced that his opportunity to defend has been substantially impaired. I find it difficult to condone the delay in sending the letter of February 27th on request of an assistant U. S. attorney; and I experience equal difficulty in excusing the disclosure of the letter to the prosecuting officer. But I know nothing of the contents of the letter, contents which were within the petitioner's knowledge and which he could have disclosed. I must, therefore, infer that had he testified to the contents of the letter it would have appeared that the effect of the delay and the disclosure upon his ability to defend was trivial.

The same reasoning makes it impossible to arrive at an inference of prejudice from the undelivered telegram. As its contents were communicated to him he has lost nothing. If they were not communicated to him why did he not so testify? I conclude that it has not been shown that the system of detention has materially impaired the petitioner's ability to defend.

In view of my findings with respect to the several issues I must conclude that no sufficient cause has been shown why the petitioner should be released. The petition is denied and the petitioner remanded to the custody of respondent.